FILED 6 SEP '22 10:25USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**MYLES NEES,**

Plaintiff,

v.

**JOSEPH BUGHER,** Assistant Director, Health Services, Oregon Department of Corr. (ODOC); **CHRISTOPHER P. DIGIULIO, MD,** Medical Director, ODOC; **WARREN ROBERTS, MD, FAANS,** Chief Medical Officer, Neurosurgeon, ODOC; **LORETTA IRVING, RN,** Medical Services Manager, (MSM), Oregon State Correctional Institution, (OSCI); **DR. THOMAS L. BRISTOL, MD,** OSCI; **DR. ZOLTAN TEGLASSY, MD,** OSCI; **BRADY WHETTEN, DPT,** OSCI, **DR. COLLADA,** ODOC, OSCI, SCI; **RN LYNCH,** OSCI; **C. GWYNN,** Corrections Officer (CO), OSCI; **JOSHUA HIGHBERGER AND GARETT LANEY**, Superintendent(s)/Functional Unit Manager(s) OSCI; **JEREMY NOFZIGER,** Hearings Officer, OSCI; **JOHN & JANE DOES 1-20,** ODOC, OSCI, SCI; employees whose identities are presently unknown to Plaintiff but who were involved in the violations alleged herein; all sued in their individual and official capacities.

Defendants.

United States District Court
No. ___6:22-cv-01354-JE

**COMPLAINT –** Federal Civil Rights, 42 U.S.C. § 1983: Deliberate Indifference to Serious Medical Needs, 8th and 14th Amends., U.S. Constitution; ADA (42 USC § 12131 *et seq.*) & Rehabilitation Act of 1973 (29 USC § 794); & Deprivation of property without Due Process, 14th Amend., U.S. Constitution; & Supplemental Jurisdictional Claims: Deliberate Indifference to Serious Medical Needs, Art. I, § 16, Or. Const.; Unnecessary Rigor, Art. I, § 13, Or. Const.; State law torts of: medical malpractice/ negligence; and violations of state statutory provisions

**JURY TRIAL DEMANDED**

**INTRODUCTORY STATEMENT**

This action is filed by Plaintiff, Myles Nees**,** an Adult in Custody (AIC) of the Oregon

Department of Corrections (ODOC), under 42 U.S.C. § 1983, for acts and omissions of the named

Defendant(s) in subjecting Plaintiff to deliberate indifference to his serious medical needs by the

improper delay and denial of diagnose and treatment of his: substantial pain (back and knee),

spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low

testosterone (pituitary tumor), toe-nail fungus, hernia, and headaches all with timely appropriate

treatment; Defendant(s) violated Plaintiff's Due Process rights by failing to comply with

procedural guarantees during disciplinary and associated restitution hearings; Had plaintiff

("Nees") been given due process there would not have been an award for restitution in the

amount of $3,820.62, in violation of the Eighth and Fourteenth Amendments to the United States

Constitution, the Americans with Disabilities Act (ADA), 42 USC § 12131, *et seq.,* and Section 504

of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Plaintiff also alleges supplemental state law

claims that the acts and omissions of Defendant(s) constituted "unnecessary rigor" and deliberate

indifference to his serious medical needs, in violation of Article I, sections 13 and 16, of the

Oregon Constitution, constituted the state-law tort of professional negligence/medical

malpractice, and violated ORS 423.020(1)(d). Plaintiff seeks declaratory relief, an award of

nominal and compensatory economic and non-economic damages and an award of reasonable

attorney fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205 and 29 U.S.C. § 794a.

## JURISDICTION & VENUE

1.    This court has jurisdiction over Plaintiff's claim of violations of federal constitutional

rights under 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiff also seeks a declaratory judgment,

pursuant to 28 U.S.C. § 2201.

2.    This court has supplemental jurisdiction over Plaintiff's state-law claims, pursuant to 28

U.S.C. § 1367(a).

3.    Venue is properly before this court under 28 U.S.C. § 1391(b)(1) & (2), in that one or more

of the defendants reside in the District of Oregon and Plaintiff's claims for relief arose in this district.

## PARTIES

4. **PLAINTIFF MYLES NEES ("NEES")** was at times relevant an AIC of the ODOC, confined at Oregon State Correctional Institution (OSCI), Santiam Correctional Institution (SCI) in Salem, Oregon, and Eastern Oregon Correctional Institution (EOCI) in Pendleton, Oregon.

5. **DEFENDANT JOSEPH BUGHER** is and was at times relevant, an Assistant Director, Health Services, of the ODOC. He is responsible for directing AIC healthcare services in the Department of Corrections, including but not limited to: (a) Developing standards for the organization, coordination and delivery of AIC healthcare; (b) Ensuring the organization and delivery of AIC healthcare meets established standards; and (c) Ensuring the operation of all areas of AIC healthcare, including medical, dental, mental health care and pharmacy services comply with appropriate professional standards, statutory requirements, and administrative rules and policies of the department. OAR 291-124-0016(1). Health Services administration shall appoint a Medical Services Manager to organize and coordinate delivery of healthcare services to AICs for each Department of Corrections facility. He personally denied Plaintiff's grievance at the final stage of the grievance process. He was personally involved in the violations alleged herein and he is sued in his individual and official capacities.

6. **DEFENDANT CHRISTOPHER DIGIULIO, MD** is and was at times relevant, the Clinical Medical Director of the ODOC. He is responsible for professional oversight of clinical healthcare providers. OAR 291-124-0016(2). Defendant DiGiulio is responsible for all decisions requiring medical judgment and directly affecting outcomes of clinical practice. OAR 291-124-0016(2)(a). Defendant DiGiulio is responsible for appointing a chief medical officer to provide oversight for professional clinical services to AICs for each Department of Corrections facility. Defendant

DiGiulio personally denied Plaintiff's grievance at the second level of the ODOC grievance process. Defendant DiGiulio is personally involved in the violations alleged herein and he is sued in his individual and official capacities.

7.     **DEFENDANT LORETTA IRVING** is a Registered Nurse (RN), who is and was at times relevant, the Medical Services Manager (MSM) at the OSCI. She is responsible for coordinating AIC access to healthcare services either at the site, in the community, or at another correctional facility. OAR 291-124-0020(2)(a). She personally denied relief requested in the Plaintiff's grievance(s), and was personally involved in the violations alleged herein. She is sued in her individual and official capacities.

8.     **DEFENDANT JOHN and JANE DOES** is and was at all times relevant an ODOC Health Services employee employed to provide healthcare services to ODOC, OSCI, SCI, EOCI, AICs. They personally denied relief requested in the Plaintiff's grievance(s), and were personally involved in the violations alleged herein. They are sued in their individual and official capacities.

9.     **DEFENDANT WARREN ROBERTS ("ROBERTS")** is, and was at all times relevant, a Medical Doctor (MD), Chief Medical Officer, and Neurosurgeon employed to provide healthcare services to OSCI AICs, and provide oversight for clinical services to AIC's at OSCI. He was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

10.     **DEFENDANT THOMAS L. BRISTOL ("BRISTOL")** was at all times relevant, a Medical Doctor (MD) employed to provide healthcare services to OSCI & SCI AICs. He was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

11.     **DEFENDANT ZOLTAN TEGLASSY** was at all times relevant, a Medical Doctor (MD) employed to provide healthcare services to OSCI AICs. He was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

12.    **DEFENDANT DOES** is, and was at all times relevant, a Nurse Practitioner (NP) employed to provide healthcare services to OSCI AICs. They were personally involved in the violations alleged herein. They are sued in his individual and official capacities.

13.    **DEFENDANT LYNCH** is, and was at all times relevant, a Registered Nurse (RN) employed to provide healthcare services to OSCI AICs. She was personally involved in the violations alleged herein. She is sued in her individual and official capacities.

14.    **DEFENDANT JOHN DOE(s)** is and was at times relevant a ODOC Health Services employee employed to provide healthcare services to ODOC, OSCI, SCI, EOCI, AICs. He personally denied relief requested in the Plaintiff's grievance(s), and was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

15.    **DEFENDANT JANE DOE** is and was at all times relevant, an ODOC Health Services employee employed to provide healthcare services to ODOC, OSCI, SCI, EOCI, AICs. She personally failed to process provider orders for medication and fill prescriptions. She was personally involved in the violations alleged herein. She is sued in her individual and official capacities.

16.    **DEFENDANT COLLADA** is and was at all times relevant, a Neurosurgeon, employed or contracted to provide healthcare and surgical services to ODOC, OSCI, and SCI AICs. He was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

17.    **DEFENDANT BRADY WHETTEN** is and was at all times relevant, a Doctor Physical Therapy ("DPT") employed or contracted to provide healthcare services to OSCI AICs. He was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

18.    **DEFENDANT(S) JOSHUA HIGHBERGER AND GARETT LANEY** were at all at all times relevant, Superintendent(s) and/or Functional Unit Manager(s) employed to provide oversight

and management of all employees to OSCI AIC's. They were personally involved in the violations alleged herein, and are sued in their individual and official capacities.

19.     **DEFENDANT JEREMY NOFZINGER** is and was at all times relevant, a Hearings Officer employed to provide Misconduct Hearing adjudication services to OSCI AICs. He was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

20.     **DEFENDANT C. GWYNN** is and was at all times relevant, a Corrections Officer employed to provide safety and security services to OSCI AICs. He was personally involved in the violations alleged herein. He is sued in his individual and official capacities.

21.     **DEFENDANTS JOHN AND JANE DOES 1-20**, were at all times relevant ODOC, OSCI, EOCI, and SCI employees responsible for providing healthcare and other services to OSCI AICs, whose identities, positions, and titles are currently unknown to Plaintiff. Once Plaintiff learns the identities of the DOC Defendants through discovery, he will amend this Complaint to substitute their proper names and titles for the DOC pseudonyms. All DOC Defendants were personally involved in the violations alleged herein and are sued in their individual and official capacities.

22.     All Defendants have acted under "color of state law" at the time of their acts and omissions alleged herein.

## FACTUAL BACKGROUND

23.     "The department shall: * * * * * (d) provide adequate . . . health and medical care, . . .

for persons confined[.]" ORS 423.020(1)(d). OAR 291-124-0005(3) provides:

Policy: It is the policy of the Department of Corrections to:

(a)     Provide professional, quality, essential, and important healthcare services that support the health status of inmates during incarceration, including end of life care.

(b)     Deliver constitutionally mandated healthcare using an efficient managed care system in support of the mission of the department.

(c)      Ensure there is an organized system in place to provide inmates with access to care to meet their serious medical, dental, and mental health needs.

(d)      Conduct procedures in a clinically appropriate manner using appropriately credentialed personnel in an appropriate setting consistent with the standards for similar care provided in the community.

OAR 291-124-0016 mandates in part:

(1)      The Health Services Assistant Director is responsible for directing AIC healthcare services in the Department of Corrections. These activities include:

(a)      Developing standards for the organization, coordination and delivery of AIC healthcare;

(b)      Ensuring the organization and delivery of AIC healthcare meets established standards; and

(c)      Ensuring the operation of all areas of AIC healthcare, including medical, . . . health care . . . services comply with appropriate professional standards, statutory requirements, and administrative rules and policies of the department.

(2)      The Health Services Chief of Medicine is responsible for professional oversight of clinical healthcare providers.

(a)      The Health Services Chief of Medicine has authority for all decisions requiring medical judgment and directly affecting outcomes of clinical practice.

(b)      The Health Services Chief of Medicine shall appoint a chief medical officer to provide oversight for professional clinical services to AICs for each Department of Corrections facility.

* * * * *

(6)      The Medical Services Administrator is responsible for the overall organization and delivery of institutional clinical care.

* * * * *

(9)      Health Services administration shall appoint a Medical Services manager to organize and coordinate delivery of healthcare services to AICs for each Department of Corrections facility.

24.      "The assigned Medical Service Manager is responsible for coordinating AIC access to

healthcare either at the site, in the community, or at another correctional facility." OAR 291-124-

0020(2)(a)

25.    "The Oregon Department of Corrections Health Services program is designed to provide

inmates with the ability to have unimpeded access to health services to meet their serious

medical, dental, and mental health needs." ODOC Policy #P-A-01 (Access to Care).

26.    "The Medical Services Manager of each facility will establish and monitor procedures,

which assure inmates' access to qualified health professionals, which include but are not limited

to clinical aspects, monitoring appropriateness, timeliness and responsiveness of care and

treatment, and review of recommendations for treatment of inmates made by health care

providers." ODOC Policy #P-A-01C.

27.    It is the policy of the ODOC "to deliver community standard care consistent with applicable

rules and standard and efficient use of resources." ODOC Policy #P-A-02

28.    "The Medical Services Manager (MSM) is the delegated, on site, medical operations

authority and may utilize all the resources at his/her disposal to see that community standard

care is provided consistent with applicable rules and standards and the efficient use of

resources." ODOC Policy #P-A-02G (Responsible Health Authority).

29.    "The Chief Medical Officer (CMO) is the delegated on site authority in all clinical matters

requiring medical judgment." ODOC Policy #P-A-02G (Responsible Health Authority).

30     "During incarceration, inmates are entitled to responsive, clinically appropriate, and timely

diagnosis, treatment and care of health problems." ODOC Policy #P-A-02.1 (Levels of Therapeutic

Care Provided by Oregon Department of Corrections, Health Services Section).

31.    "The health care services provided by the Oregon Department of Corrections will be

consistent with the standard for such services in the community." ODOC Policy #P-A-02.1 (Levels

of Therapeutic Care Provided by Oregon Department of Corrections, Health Services Section).

32.    On or about November 3rd, 2019, Nees had an appointment with Physical Therapist (Doe

#1) from the local hospital while at EOCI after having an MRI in furtherance of diagnosing back and leg pain, nerve pain, loss of mobility, and difficulty with daily living activities.

33.    **DOE #1** performed an exam and said, "this isn't a muscle or strength issue and you will likely need to see a neurosurgeon. They may want to give a cortisone injection or something else to give you some pain relief in the interim."

34.    **PLAINTIFF NEES** responded by telling him that, "the TLC committee has already approved an appointment with Dr. Roberts (the DOC Neurosurgeon). And, "is there anything else I can do such as stretching or exercises that can help in the interim?"

35.    **DOE #1** recommended laying on back and pulling knees to the chest, and nothing else.

36.    On or about November 4th, 2019, Plaintiff was transferred to OSCI to be in close proximity to OHSU for a scheduled appointment with Dr. Chaim Vannek (Endocrinologist Pituitary Tumor). To address the persistent abnormal blood tests results which had been getting progressively worse without notification to Nees. All while Nees was complaining about the dose of Cabergoline, and noting his levels were good prior to coming to the ODOC.

37.    While at OSCI Nees sent multiple Medical Request forms regarding: Diagnosis, Treatment Plan, and Prognosis; Treatment for Pain; Mental Health Treatment that included substance abuse; Follow-up appointments; Therapeutic Level of Care ("TLC") meeting results; Test results; Constitutionally Mandated Level of Care; Purchase of Care. All handled by above named Defendant(s).

38.    **DEFENDANT ROBERTS** acting as the ODOC neurosurgeon saw Nees and ordered Physical Therapy ("PT") with Brady Whetten.

39.    **PLAINTIFF NEES** explained that he had already seen a DPT, and was expecting to get a

cortisone injection for pain and see a neurosurgeon for surgery.

40.     **DEFENDANT ROBERTS** explained that he was the Neurosurgeon for the ODOC and he liked to use DPT Whetten as they worked well together.

41.     **DEFENDANT WHETTEN** saw Nees and prescribed multiple core strength building exercises by giving him a two-year-old printed sheet of exercises for a different patient with a few exercises marked by hand.

42.     **PLAINTIFF NEES** explained what the prior Physical Therapist found and requested those records be reviewed. That he had been doing different exercises and stretches for years with no real improvement. Nees explained he was in substantial pain. That he was having real trouble doing most everything, and needed to get on the road to a solution, or at-least begin a treatment plan with an acceptable prognosis. Nees pleaded with Whetten to look through the records and see that this began with lifting weights at Columbia River back on 2008 or so, and has progressively gotten worse. Telling Whetten, "it affects every area of my life".

43.     **DEFENDANT WHETTEN** was unable locate those records in the file and said, "we just do these for everyone" and "this is what Roberts wants" (meaning the exercises).

44.     **PLAINTIFF NEES** asked Whetten how these exercises address the "Spinal Stenosis" diagnosis given by Roberts? Whetten responded by saying, "they don't. We're just hoping they will make it better." Nees responded by saying, "we're way past hoping and that the eighth amendment requires treatment" as the pain makes daily living unbearable at times, and has me considering suicide.

45.     PLAINTIFF NEES After the first course of PT Nees went back to see Roberts. Nees was expecting and requesting treatment-plan, prognosis, diagnosis, and to review the actual MRI in hopes of understanding the problem in a way to increase the likely hood of successful treatment. Roberts

was unable to use the computer to show MRI, but agreed to get it figured out and do it next time

he came in. Roberts then did a physical exam and reviewed Whetten's notes/findings along with

the MRI's written report on findings. Roberts said the PT seemed to be helping which Nees

quickly countered with the reality of how little and short lived any possible benefit the PT

actually had. Pacifically, that Nees' issues were overall getting worse, but that Nees was getting

better at managing his symptoms due to prison conditions, and his acceptance of the severe

restrictions to his activities until he gets treatment plan that addresses the diagnosed condition.

Nees asked to have his medical records reviewed from Mult. Co. Health Dept. and OHSU to see

how prior to being arrested he had an appt. with Epic Imagine for comprehensive current scans

for the referral to pain clinic and associated DPT as Nees' primary care at Mult Co. said he

couldn't get approved for surgery without recent PT consult, but needed specialized care for the

pain beyond what Mult. Co. provides. Nees pleaded with Roberts for help, or a referral to

someone who could help him, and re-asserted the things that DOE#1 proposed: cortisone shot

and surgery. Roberts agreed to present to TLC for outside surgery consult and said that he doesn't

give cortisone shots, and to address his questions to provider. Finally, Roberts ordered more PT

which Nees agreed to do his best with. Nees ended up doing two separate stints of Physical

Therapy which made both pain and mobility worse at times.

46.    **PLAINTIFF NEES** went many months without being seen by providers, specialists, or

other care providers, and still has not received any treatment-plan with prognosis. Even after

being promised those very things during grievance process.

47.    **PLAINTIFF NEES** asked for reasonable accommodations under the ADA, and was told,

"Ask your counselor" and "We don't do that here". Accommodation was to have his diagnosis,

treatment plan and prognosis clearly communicated to him in writing with a description on what

parts of the treatment plan are Nees' responsibility, and what are the responsibility of health services which is listed on poster in medical as something AIC's are to expect thus, entitling Nees' to an accommodation under the ADA if his Bi-Polar I disorder was causing him to not actually receive the treatment that Defendant(s) were saying they were providing.

48.    **PLAINTIFF NEES** sent multiple Medical Request Forms and Inmate Communication Forms about his Depo Testosterone. All were effectively ignored by above named defendant(s), and Nees was not given the prescription which was ordered, approved by TLC, and left unprocessed for months in his medical file. All while Nees was requesting and waiting for defendant(s) to perform their constitutional duty.

49.    **DEFENDANT TGLASEY** decided to wait on renewing the order of Depo Testosterone because Nees' blood work showed his prolactin and testosterone levels were in normal ranges. Nees explained that it had taken nearly a year to get those levels in normal ranges again after having the wrong dose of Cabergoline for months at EOCI, and failing to get blood work levels to Dr. Vaneek at OHSU. Nees explained that the reason the levels are good is because of the medicines and good compliance with taking every dose, and the medicines are needed because of Tumor that's why it was covered by insurance "on the streets" (in the community) outside of prison.

50.    **DEFENDANT TGLASEY** said that he was worried the TLC would not approve it because it's a controlled substance and that he wanted to get blood work again after not having any medicine left in his system to see if levels go below normal, and submit when the levels are low in hopes that it will ensure approval. Nees explained that he had been on the medication since before being arrested and that his Endocrinologist has said we have stopped the tumors growth at 7mm and will just continue these medications with regular monitoring of the tumor via MRI and blood

work instead of a surgery. That the medication is needed, and has been approved multiple times.

51.    **PLAINTIFF NEES** went in for the blood work the following week and began requesting the results, his medicine, TLC results on the Depo testosterone, and an appointment with Tglasey.

52.    **PLAINTIFF NEES** had an office visit with Tglasey after waiting nearly four months. During that visit Tglasey was surprised I hadn't been getting my injections and quickly found the TLC approval form and order for the Depo testosterone that had been completed months ago and just never got processed through to the pharmacy. Nees asked who was responsible, and Tglasey didn't know, but guaranteed that he would get it done that day and I'd have an injection in a day or two. Nees expressed his concern that his kytes, medical requests, and grievances go through the system, but doesn't actually provide any real access to care when they are ignored, or returned unsigned with a statement saying, "scheduled for provider" or some other generic term that effectively denies both access and accountability.

53.    **DEFENDANT ROBERTS** interacted with Nees as the Neurosurgeon. Over the course of these interactions Roberts explained that MRI's alone are insufficient to diagnose or treat spinal issues, and would refer questions and requests for explanation of treatment plan-diagnosis-prognosis to provider. Nees explained that he needed some pain relief, and at times can hardly function to the point of contemplating suicide, and when he asks his provider they say: Roberts is dealing with this, it's up to TLC, or TLC has said do this. Roberts still told Nees to talk to his provider.

54.    **DEFENDANT ROBERTS** evaluated Nees after the second round of PT with Whetten was finished. Roberts ordered a new set of lumbar X-rays and MRI to be included with his and Whetten's findings to request an outside neurosurgeon appointment from TLC. Roberts explained that he was a Neurosurgeon but didn't do any actual surgeries for the ODOC, and that he was

fairly certain the TLC would approve an outside surgeon consult with a surgeon who would actually do the surgery.

55.     **PLAINTIFF NEES** was relieved as he was finally going to get a treatment-plan, diagnosis, prognosis, some pain relief, and the prospect of a much-needed improvement in quality of life.

56.     **DEFENDANT ROBERTS** deliberately delayed the final step of this process for many months, by putting off the appointment to review the MRI, X-rays, and do the work-up for TLC approval. Nees sent in multiple requests and was continually told that he had an appointment set, that a chart review had taken place, or that Roberts is very busy and will see him when he wants to see you.

57.     After waiting months and months Nees was seen by Roberts, but the most recent MRI was not in the Medical Record or otherwise available for review. Roberts explained that the old one was there and someone must have made a mistake, or not known there was more than one.

58.     **PLAINTIFF NEES** asked Tglasey, Bristol, and other defendant(s) for the information that Roberts would not provide along with someone to require that Nees is actually seen. Response by all was about the same, "Roberts is the Chief Medical Officer, a neurosurgeon, and part of the TLC" basically, he is the boss and this isn't a life or death thing. Nees will just have to suffer.

59.     **DEFENDANT ROBERTS** had the in-person appointment after a year's long delay, and explained that he was only seeing people with life-threatening issues as he had been very busy with all the Covid-19 stuff. He is the Chief Medical Officer and was going all over the state to set-up protocols and stuff. Robert's said he was doing chart reviews to make sure no-one was in a life or death situation, or likely to become paralyzed without being seen sooner. Nees explained that he (Roberts) was the only person dealing with this issue, Thus, no reason to review a chart to find notes on an issue he was responsible for handling.

60.    **PLAINTIFF NEES** clearly and directly communicated his belief that his Constitutional

Rights were being violated to all defendant's. That the failure to treat pain amounts to cruel and

unusual punishment under the 8th Amend. That he was entitled to a standard of care above

emergency care, or care that is required in order to keep a person for dying. Being denied care by:

delaying appointments, lack of follow-up, failing to process orders, failing to coordinate care with

specialist and outside facilities, refusing to go over test results, communicate anything near a

treatment plan that includes a prognosis, and failing to deliver medications all amount to

deliberate indifference.

61.    **PLAINTIFF NEES** is not able to get and use medical insurance, go to a doctor of his choice,

get any of the over the counter or other non-medical devices that people in the community can

get to help them manage their symptoms. The ODOC advertises a policy of allowing AIC's to

purchase care. Nees was denied the option to purchase care himself on every occasion it was

requested.

62.    ODOC Health Services Policy or custom was and still is a moving force behind injuries, and

Constitutional Violations alleged herein. Defendant(s) DOE(s), Lynch, and Tglasey have admitted

that the ODOC health services system causes most issues, and makes providing a standard level

treatment hard if not impossible.

63.    **DEFENDANT TGLASEY** quit working for the ODOC, and went back to the Oregon State

Hospital over his frustration with not being able to provide a standard level of care to his patients

within the ODOC and at OSCI to include Nees.

64.    Dr. Garth Guilick who worked as Provider for the ODOC, and while at the Snake River

Correctional Institution testified Under Oath in a deposition that, "I (we) don't care about AIC

pain levels, and AIC's do not receive a standard level of care" within the ODOC.

65.    The Oregon Department of Corrections is legally and financially responsible for providing

Healthcare:

> **"291-124-0020 Facilities and Equipment for Provision of Health Care:**
>
>> (2) Level of Service at Each Facility:
>>
>> (a) The assigned Medical Service Manager is responsible for coordinating AIC access to healthcare services either at the site, in the community, or at another correctional facility.
>>
>> (b) Healthcare services at correctional facilities shall at a minimum include instruction and supervision of self-care, ambulatory care, emergency care, and referrals for specialty services.
>>
>> (f) Health Services staff will make provisions for hospital access and specialty care as necessary for the healthcare of the AIC.
>
> **291-124-0035 Emergency Services:**
>
>> (1) Health Services employees will be trained to respond to health emergency situations involving AICs, employees, visitors, and others on the facility's premises or worksites.
>>
>> (3) Each facility Medical Services manager shall assure that healthcare employees are trained and prepared to provide emergency medical assistance.
>>
>> (4) Emergency medical care exceeding the scope or capacity of the facility or staff will be supplemented by emergency medical response agencies in the community."

66.    The Due Process Clause protects inmates from being deprived of liberty or property

without due process of law. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). Wolff sets forth the

minimum procedural protections that must apply to prison disciplinary proceedings. *Id.*

67.    The Ninth Circuit summarized those requirements as follows: First, written notice of the

charges must be given to the disciplinary-action defendant in order to inform him of the charges

and to enable him to marshal the facts and prepare a defense; Second, at least a brief period of

time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the

appearance before the [hearings officer]; Third, there must be a written statement by the fact-

finders as to the evidence relied on and reasons for the disciplinary action; Fourth, the inmate

facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals; Fifth, where an illiterate inmate is involved or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or to have adequate substitute aid from the staff or from an inmate designated by the staff.

68.  **Procedures for Handling Misconduct by AICs:**

"(2) Misconduct Reports:

(A) The misconduct report shall include a description of any unusual relevant AIC behavior and information regarding how the employee became aware of the behavior. The report shall identify all discovered information related to the incident (including video, memos, etc.). The misconduct report must contain sufficient and complete facts to support the alleged rule violation(s), including a description of what the restitution is for and the amount of restitution to be ordered, if applicable. The misconduct report must contain sufficient information to allow the AIC to prepare a defense.

(f) Reports from all employee and non-employee service provider witnesses shall also be submitted.

69.  **291-105-0028 Conduct of Formal Hearings:**

(6) At the hearing, the AIC will be allowed to exercise rights as allowed in OAR 291-105-0056.

**(9) Testimony of Witnesses:**

(a) The Hearings Officer shall direct the scheduling and taking of testimony of witnesses at the hearing. Witnesses may include AICs, employees, or other persons. Testimony may be taken in person, by telephone, or by written report or statement.

(b) The AIC may request that the Hearings Officer schedule witnesses to present testimony at the hearing. The request should be submitted to the Hearings Officer in writing in advance of the hearing and include a list of all persons the AIC requests be called to testify, and the questions sought to be posed to each person. Requests for witnesses must minimally be made to the Hearings Officer at the time of the hearing. The AIC must provide sufficient evidence for the Hearings Officer to conclude that the results of the testimony provided by witnesses will either constitute a defense to the alleged violation(s) or substantially lessen the severity of the violation(s). The Hearings Officer shall arrange for the taking of testimony from such witnesses as properly requested by the AIC, subject to the exclusions and restrictions provided in

these rules. Requests for witnesses made or received after a hearing is decided will not be considered.

(e) The Hearings Officer may exclude a specific witness upon finding that the witness' testimony, together with all reasonable inferences to be drawn from that testimony, would not constitute a defense to the charge, would not substantially mitigate the violation, or would not assist the Hearings Officer in the resolution of the disciplinary action. The Hearings Officer may exclude a specific witness upon finding that the appearance of the witness at the hearing would present an immediate undue risk to the safe, secure, or orderly operation of the facility, specifically including the safety and security of employees and AICs. If a witness is excluded, the reason(s) shall be made a part of the record.

(g) Persons requested as witnesses, other than employees, may refuse to testify.

**(10) Documents and Physical Evidence:**

(c) The Hearings Officer may exclude documents and physical evidence upon finding that such evidence would not assist the Hearings Officer in the resolution of the disciplinary action or that such evidence would present an undue risk to the safe, secure, or orderly operation of a facility, specifically including the safety and security of employees and AICs. The reason(s) for exclusion shall be made a part of the record.

(d)*** The reason(s) for classifying documents and physical evidence as confidential shall be made a part of the record. Documents and physical evidence classified as confidential by the Hearings Officer shall not be shown or otherwise provided to the AIC.

(e) The Hearings Officer may show to the AIC or read into the record any evidence submitted. However, the Hearings Officer will not provide copies of the evidence to the AIC. AICs may request and obtain copies of nonexempt records in accordance with the Department's rule on Release of Public Records (OAR 291-037).

70.   **291-105-0056 AIC Rights in Formal and Informal Hearings:**

(4) Representation:

(a) In all cases, the AIC shall be entitled to:

(A) Provide a defense through written or oral testimony.

(C) AICs shall be excluded during the testimony of any witness whose testimony must be given in confidence. The reasons for the AIC's absence or exclusion shall be made part of the record.

(5) AICs shall be allowed to submit evidence, except when the Hearings Officer or adjudicator finds that to have the evidence present would constitute an immediate threat to a facility or not assist in the resolution of the hearing, as provided in OAR 291-105-0028 or OAR 291-105-0046.

71.   **291-105-0069 Additional Sanctions for Major Violations:**

The additional sanctions available to the Hearings Officer for major violations include, but are not limited to:

(1) Restitution: AICs shall be responsible for making full restitution for any damage or loss of property. In addition, AICs shall be financially responsible for all costs associated with or resulting from the violation. These shall include the costs of any drug urinalysis testing and other costs incurred by the Department of Corrections as a result of the AIC's actions. There is no limit on the amount of restitution which can be imposed. There must always be a factual basis in the record to support the restitution amount."

72.     **DEFENDANT NOFZIGER** used guess work and speculation to award $3,820.62 "100% cost of outside medical care due to misconduct for AIC Nees #11703428" During the hearing Mr. Nofziger viewed video evidence to see whether or not AIC Nees was dropped by Security, or had his head hit on the railing coming down the stairs causing the need for EMS. Nofziger also speculated that the need for Nees to be, "escorted out of the facility to receive a higher level of care" was due to Nees' "collapsing", "losing consciousness", or "passing out", but prior to being transported from the facility, "AIC Nees continued to verbally berate staff for the next 20 minutes***attempted to bite Sgt. Summers***while waiting for EMS to arrive." There is no evidence of what treatment was provided, or why it was needed only that tests were performed. Notably, Nees refused all medical treatment while at the hospital as soon as he was able, and had a follow-up Ultra Sound and biopsy connected to the tests performed in the ER. Nees has a Thyroid Nodule and Pituitary Tumor. The "cost of outside medical care" was NOT provided by a "fiscal analyst" indicating that the "ODOC paid $3,820.62 for medical care due to misconduct", but by the Health Services Manager in response to an E-Mail by Nofziger which placed the Health Service Manager in the role of Fact-Finder and failed to ensure the amount was for actual costs incurred as a result of the AIC's actions. Further, this type of evidence is constitutionally insufficient, and the misconduct report only mentions that this took place while waiting for EMS. There is no description of any type of restitution other than the approx. $10 for sheets. No mention of any higher level of care being needed or provided, and no mention of any other medical expenses being caused by Nees' misconduct.

73.    **PLAINTIFF NEES** requested witnesses in writing prior to the hearing.

74.    The Misconduct report did not mention or describe the potential restitution for medical costs. Nees requested evidence and access to evidence in writing prior to the hearing, and the record does not support a finding of costs incurred due to misconduct. Specifically:

> The medical costs were for "Tests" not any kind of treatment;

> There's no evidence those "costs" were actually paid by the ODOC;

> Medical staff did not submit reports;

> Hearings Officer refused to read reports into the record;

75.    **DEFENDANT LYNCH** told security staff at the time of incident that Nees was just drunk and needed to sleep it off. Lynch confirmed that the reason Nees wasn't given the approved and prescribed Testosterone was due to above named defendant(s) failure to process order, or to even look into the records after numerous Medical Requests.

76.    **DEFENDANT(S) HIGHBERGER and LANEY** ordered or approved the order of $3,820.62 in restitution recommended by Nofziger, in the disciplinary and restitution hearings. They denied Nees' appeal to the Functional Unit Manager highlighting the Constitutional violations that were taking place, or would be if they approved Nofziger's recommendation.

77.    $3,820.62 was debited from Nees' inmate trust account by the ODOC.

78.    **PLAINTIFF NEES** submitted for the record Corrections Information Systems Oregon Corrections Plan showing Substance Abuse designation "SUBA  SUB3  3=Dependence/Addiction" which is a recognized Mental Health Disorder that Nees was denied treatment for. Further, use of an intoxicating substance is an expected outcome for a person diagnosed with such a substance abuse disorder without being given any treatment, and any costs associated with this are

ultimately the ODOC's responsibility as it's related to a disorder they are legally responsible for.

79.     **DEFENDANT NOFZIGER** denied access to evidence that included: witnesses, report contents, audio and video recordings all without the specific required findings to deny such access.

80.     **ALL DEFENDANT(S)** failed to act when they had both a duty and the power to correct the Constitutional Violations alleged herein.

81.     **ALL DEFENDANT(S)** failed to use such care as a reasonably prudent and careful person would use under similar circumstance. Prison officials owe prisoners duty of care to protect them from risks that, as prisoners, they have diminished ability to protect themselves. Medical personal owes the same duty of care to prisoner-patients as they do to "free world" patients.

82.     **ALL DEFENDANT(S)** acted in violation of State and prison policies/regulations, and are not immune, because, those policies conform to clearly established law, and the Constitution. Had these policies and regulations been followed no Constitutional violation would have occurred.

83.     **ALL DEFENDANT(S)** were made aware of these Constitutional issues.

84.     **ALL DEFENDANT(S)** wrongful conduct has continued, and injury to Plaintiff is accruing. Had defendants at any time ceased their wrongful conduct, and/or fulfilled their Duty, further injury would/could have been avoided.

85.     The ongoing policy/practice of deliberate indifference to medical needs is furthered by delay as denial, use of TLC committee, coordinating and implementing care provided by specialists and contractors along with ongoing failure to treat significant pain, loss of mobility, reduction in quality of life, and failure to treat the underlying medical conditions that are the cause of above injures.

86.     **ALL DEFENDANT(S)** are not entitled to immunity, because, the actions or failure to act in these claims are operational not discretionary, but even discretionary functions do not entitle defendants to immunity for acts that are intentional or deliberately indifferent such as the acts alleged herein.

87.     Providing medical care, and filling prescriptions are operational functions.

88.     **DEFENDANT LYNCH** told Nees that medical believes most things just resolve on their own and that is why they do not set-appointments, or respond fully or timely to medical requests. This systemic policy or practice of failing to address medical issues, by delaying treatment until: the issue becomes chronic, the AIC is released, the AIC gives up, or when AIC is seen by the provider they cannot treat the accumulation of unaddressed, and resolved issues which contributes to the ongoing harm and Constitutional Violation(s).

89.     **DEFENDANT TGLASEY** submitted multiple requests to the TLC for medication to treat NEES' nail fungus because, the way it was growing caused pain, bleeding, and risked having fungus spores get into Nees blood system which included a "Purchase of Care" option due to the medicine being formulary only for diabetics in the ODOC. After being denied Tglasey suggested nail-removal as he was able to do that in office without the TLC's intervention, but referred Nees to the podiatrist ("DOE #3") for the removal.

90.     **PLAINTIFF NEES** went to podiatrist appointment and explained that he was there for nail-removal to get rid of the fungus, but the podiatrist took a look, and said, "No, you just need to take this medicine for three months." Nees explained that he had been trying to get medicine and was even willing to pay the cost of it, but the TLC was saying no. The podiatrist wrote a prescription that was never filled, and a few weeks later Nees' right great toe nail was removed by Tglasey with Lynch's assistance causing much pain, difficulty in daily living, and with significant risk.

91.    **DEFENDANT TGLASEY** never treated Nees' pain, went many months without seeing Nees, and caused Nees to be without necessary medicine for months.

92.    **ALL DEFENDANT(S)** have never given Nees diagnosis/treatment-plan/prognosis as it relates to his spinal stenosis and associated pain and lack of mobility, but Bristol finally gave Nees a cortisone injunction in his back around April 10, 2022 which provided some pain relief. This type of injection was suggested by DOE #1 three years ago, and Nees repeatedly brought that suggestion up, and asked for some kind of pain relief and a treatment plan prognosis in his appointments, but was always denied.

93.    **DEFENDANT BRISTOL** did not need to submit any request to TLC, and gave the injection once he realized Nees was not leaving that appointment without something being done as he was just told that Dr. Collada was denying surgery, an in-person consult, and recommended Nees lose weight. Bristol told Nees that his pain isn't that bad that everyone's back hurts, and he'll just have to learn to live with it.

94.    **DEFENDANT ROBERTS** interacted with Nees as the Neurosurgeon. Over the course of these interactions Robert's explained that MRI's alone are insufficient to diagnose or treat spinal issue. Roberts would refer all questions about diagnosis/treatment-plan/prognosis to Provider. Nees would explain that he needed some pain-relief; that he can hardly function at times to the point of contemplating suicide. Roberts told Nees to talk to his Provider.

95.    **DEFENDANT ROBERTS** evaluated Nees after the second round of PT with Whetten at which time Roberts ordered multiple x-rays, another MRI, and for Nees to see an outside Neurosurgeon. One that actually does the surgeries on AICs in the ODOC.

96.    **DEFENDANT ROBERTS** delayed Nees' treatment for many months by deliberately putting off the appointment to go over the test results and do the actual referral to outside surgeon. Nees

sent many requests to have this final step completed which were effectively ignored. Nees was

told that he was, "scheduled" after having a chart review was done or some other excuse for not

being seen. Roberts explained the long delay as a decision to table all "non-life threatening" cases

by way of periodic chart review as he was too busy dealing with all the Covid stuff as the ODOC's

Chief Medical Officer. Nees responded by explaining that there would be nothing in chart to

review as he was the one treating him, and AIC's are entitled to more than just care for things that

are life threatening.

97.     **ALL DEFENDANT(S)** are the proximate cause of Nees' pain, suffering, and have physically

impacted Nees by the denial and delay of medical treatment.

98.     **ALL DEFENDANT(S)** deprivation of medical care caused mental anguish, possibly done

permanent injury, caused lasting harm, and severely impacted his quality of life.

99.     **PLAINTIFF'S** injury is concrete enough that compensatory damages can be awarded. In

the alternative plaintiff is entitled for presumed damages where the injury is impossible to

measure.

100.    **ALL DEFENDANT(S)** were informed of the Plaintiff's Rights under the Constitution and

associated case law that were either being violated or would be violated if they continued in their

course of action.

101.    **DEFENDANT LYNCH** responded to Nees' questions about the level of care he was receiving

by saying, "don't come to prison" and you'll get what you want. Nees immediately responded with

the "free world" standard and telling her that her dismissing Nees' medical needs and her

statement are a violation of the 8th Amend, and ODOC posted policy. Lynch responded with, "you

get plenty enough care."

102.    On or about 8-01-22 Bristol was explaining how the "free world" or "community" standard

of care doesn't exist within the ODOC and that he didn't understand the "legal talk", but finally conceded to knowing the legal standard of care in front of the provider in training (Linda) as Nees explained how that very standard of care is advertised on the ODOC website that AIC'S family and friends look to for info.

103.    A juror in their common experience can infer whether the care provided by Defendant's was consistent with either the "community" standard, or "free world" standard level of care.

104.    A Juror can use their common understanding and experience to infer a willful-deliberate act by Any/All Defendant's that resulted in a violation of Nees' Constitutional Rights, or constitutes the State law tort of negligence/medical malpractice.

105.    A juror can infer deliberate indifference or willful knowing conduct on the part of Any/All defendants by their actions designed to avoid accountability, responsibility, and detection. In other words, a juror can view all the evidence in this case and infer that Any/All defendants acted in a manner consistent with awareness of duty, decision to be personally involved in violating Nees' Rights, and consciousness of guilt.

106.    **DEFENDANT DOES** used metal cuffs as therapeutic restraints during incident leading to Misconduct Report, supra. In violation of ODOC Policy and Procedure.

107.    Nees was cuffed in very tight metal restraints by security staff for many hours that left painful indents and bruises on both lower arm and wrist areas for two weeks.

108.    Nees was injected by a drug against his will after being cuffed and visibly resisting medical assistance.

109.    Security Staff woke Nees up by physically jarring Nees' body while he was cuffed to a bed/board surrounded by multiple people.

110.    **PLAINTIFF NEES** would attempt to bite the hands of people that came towards his face.

111.    A person that is unable to use his hands or feet to keep his airway clear would reasonably fear having a hand put on/over his face.

112.    **PLAINTIFF NEES** was not deemed to be a threat to himself or others prior to being cuffed to the board/bed.

113.    **DEFENDANT JOHN AND JANE DOES** were unable to move Nees from the housing unit's upper tier to the clinic safely, and without incident. Due in part to Nees' weight, size, and the physical constraints of the walkway/stairway.

114.    **PLAINTIFF NEES** was sent to the local hospital without any need for medical treatment.

115.    The first thing Nees said to staff in the hospital room when he woke up was, "I refuse any and all of this. I do not and did not consent to any of this. Who is paying for this? Why am I here?"

116.    ODOC Staff were nice and said, "the prison will pay for everything. Don't worry. We just wanted to make sure you are OK." The hospital worker said, "we still need to do an ultra-sound on the Thyroid growth/nodule we found on the scan." Nees replied with, "No, get me back to the prison. Get these needles out of me now. I did not consent to any of this, and am refusing any and all treatment. I will sign out AMA if need be. The Thyroid nodule is not new. I have a pituitary Tumor as-well, and the ultra-sound can be done in prison."

117.    **DEFENDANT LYNCH** has recounted to Nees on numerous occasions how he (Nees) called her (Lynch) a bitch, that he was drunk and needed to sleep it off, and joked about her position of power to exact revenge, and/or inflict pain on Nees for calling her a bitch.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

118.    Plaintiff has fully exhausted all available administrative remedies with respect to the

claims alleged herein as required by 42 USC § 1997e(a) of the Prison Litigation Reform Act (PLRA).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF:

### 8th & 14th Amendments Violation

### Deliberate Indifference to Serious Medical Needs (All Defendants)

119.    Plaintiff re-alleges the facts set forth in paragraphs 1-118, *supra,* as if more fully set forth herein.

120.    The acts and omissions of **ALL DEFENDANTS**, jointly and severally, constitute deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution, by improperly delaying and denying adequate diagnosis and treatment of his serious medical needs from March 12, 2019 to the present.

### SECOND CLAIM FOR RELIEF:

### 8th & 14th Amendments Violation: Deliberate Indifference to Serious Medical Needs

### Failure to Adequately Staff, Train & Supervise

### (DEFENDANTS BUGHER, DIGIULIO, WARREN, IRVING & DOES)

121.    Plaintiff realleges the facts set forth in paragraphs 1-120, *supra,* as if more fully set forth herein.

122.    The acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or **DOES,** jointly and severally, in failing to properly staff, train and supervise subordinate employees in a way and to a degree that improperly subjected Plaintiff to deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution, in one or more of the following particulars:

(a)    For a time, **DEFENDANT DIGIULIO** has failed to comply with his duty to appoint a chief medical officer to provide oversight for professional clinical services to inmates at the OSCI, in violation of OAR 291-124-0016 (2)(b);

(b)    **DEFENDANT DIGIULIO** has failed to comply with his duty under OAR 291-124-0016(2) to provide for professional oversight of the clinical healthcare providers at OSCI & SCI in their acts and omissions related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(c)    **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(b) to ensure that the delivery of inmate healthcare provided to Plaintiff in the diagnosis and treatment of his serious medical needs from March 12, 2019 to the present meets established standards;

(d)    **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(c) to ensure that the operations of all areas of inmate health care services at OSCI & SCI comply with proper professional standards, statutory requirements, and ODOC rules and policies, with respect to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(e)    **DEFENDANT BUGHER** has failed to properly train and supervise Defendant Irving in the proper organization and coordination of the delivery of healthcare services to inmates at the OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(f)    **DEFENDANT DOE**, the administrator for Clinical Operations has failed to comply with his/her duty under OAR 291-124-0016(6) to ensure the overall organization and delivery of institutional clinical care at OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(g)    **DEFENDANT IRVING** has failed to comply with her duty under OAR 291-124-0020(2)(a) to properly coordinate inmate access to healthcare, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present; and/or

(h)    **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN** and/or **DOES** have failed to properly train and supervise subordinate employees in the proper delivery of inmate health care, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present.

### THIRD CLAIM FOR RELIEF:

### 14th Amendment Violation: Due-Process Violations

### (DEFENDANTS LANEY, HIGHBERGER, GWYNN, NOFZIGER, & DOES)

123.    Plaintiff re-alleges the facts set forth in paragraphs 1-122, *supra.* as if more fully set forth

herein.

124.    The acts and omissions of **DEFENDANTS LANEY, HIGHBERGER, GWYNN, NOFZIGER,**

and/or **DOES**, jointly and severally, constitute the denial of procedural and substantive due-

process in violation of the Fourteenth Amendment to the United States Constitution, by

improperly denying access to witnesses and evidence.

125.    The Due Process Clause dictates that adults in custody must "be allowed to call witnesses

and present documentary evidence in his defense," at least "when permitting him to do so will not

be unduly hazardous to institutional safety or correctional goals." *Wolff, 418 U.S.* at 566. Thus,

prison officials may limit an adult in custody's ability "to compile . . . documentary evidence." *Id.*

When prison officials do deny an adult in custody access to documentary evidence, it is "useful for

the [officials] to state [their] reason." Id. "[P]rison authorities may not deny a defendant this right

'solely for the sake of administrative efficiency,' and must carry the burden of proving an

adequate justification for the denial of a particular prisoner's requests." *Mainard v. Fitzpatrick,* 8

Fed.Appx. 614, 616 (9th Cir. 2001) (quoting *Bostic v. Carlson,* 884 F.2d 1267, 1273-74 (9th Cir.

1989)). Other circuits have applied these principles to restitution orders in prison disciplinary

hearings. *See Barber v. Wall,* 66 Fed.Appx. 215, 215-16 (1st Cir. 2003) (finding no due process

violation where an adult in custody was ordered to pay restitution for destruction of prison

property but was given "estimated repair costs" before his disciplinary hearing).

126.    **DEFENDANTS LANEY, HIGHBERGER, GWYNN, NOFZIGER,** and/or **DOES**, jointly and

severally, violated the due process clause, and are not entitled to qualified immunity. "The

doctrine of qualified immunity protects government officials from liability for civil damages,"

*Wood v. Moss*, 134 S.Ct. 2056, 2066-67 (2014), when "the right asserted by the plaintiff was not

clearly established or the officer could have reasonably believed that his particular conduct was lawful, *Romero v. Kitsap County.*, 931 F.2d 624, 627 (9th Cir. 1991). To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017). "The clearly established requirement operates to ensure that before they are subject to suit, government officials are on notice their conduct is unlawful." *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (simplified). The plaintiff bears the burden of making a showing that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). These rights were clearly established by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and **DEFENDANTS LANEY, HIGHBERGER, GWYNN, NOFZIGER,** and/or **DOES**, jointly and severally, were "on notice [that their] conduct was unlawful." *Eng*, 552 F.3d at 1075.

127.     **DEFENDANTS LANEY, HIGHBERGER, GWYNN, NOFZIGER,** and/or **DOES**, jointly and severally, failed to act when they had both a duty and the power to correct the Constitutional Violations cited in appeal and review request of Hearings Officer recommendation.

128.     The Constitutional violation is plain on the above cited misconduct report as there was no info regarding trip to hospital, or any costs associated to misconduct beyond the cost of sheets. Further, defendants normally divide the cost of medical expenses in assaults between the parties involved. The failure to divide the costs equally between the parties involved in this case violates plaintiff's right to equal protection.

129.     **DEFENDANT(S)** failure to perform duty imposed by the above rules/regulations make defendants personally liable as those regulations are how Plaintiff's Constitutional Rights are fulfilled.

130.    **DEFENDANT(S) HIGHBERGER and LANEY**, reviewed and approved the recommendations made by Nofziger, and personally contributed to Plaintiff's Constitutional Rights being violated.

131.    **DEFENDANTS LANEY, HIGHBERGER, GWYNN, NOFZIGER,** and/or **DOES,** jointly and severally, violated Nees' procedural due process rights and caused an injury of $3,820.62. This injury caused emotional distress, mental anguish, and contributed to the Plaintiff feeling suicidal as a result of being in constant pain, locked in a cell without the faith in Due-Process, or other Constitutional rights. Plaintiff felt like he was being tortured.

132.    **DEFENDANT(S) HIGHBERGER and LANEY**, jointly, severally, and individually were personally involved in the constitutional deprivation, and there is a sufficient causal connection between **HIGHBERGER and LANEY's** wrongful conduct and the constitutional violation.

**THIRD CLAIM FOR RELIEF:**

**Americans With Disabilities Act (ADA) & Rehabilitation Act**

**(41 USC § 12131, et seq.; & 28 USC § 794) (All Defendants)**

133.    Plaintiff re-alleges all facts set forth in paragraphs 1-132, supra, as if more fully set forth herein.

134.    The acts and omissions of **ALL DEFENDANTS**, jointly and severally, constitute the denial of the benefit of services, programs and activities of the public entity due to Plaintiff's disability, and the cost of providing medical care for that disability, in violation of the Americans With Disabilities Act (ADA), 42 USC § 12131, et seq., and the Rehabilitation Act of 1973, 29 USC § 794, by improperly delaying and denying proper and adequate diagnosis and treatment of his serious medical needs from March 12, 2019 to the present.

//////

SUPPLEMENTAL JURISDICTION CLAIMS

**FOURTH CLAIM FOR RELIEF: Article I, § 16, Or Constitution**

**Deliberate Indifference to Serious Medical Needs (All Defendants)**

135.    Plaintiff re-alleges all facts set forth in paragraphs 1-134, supra, as if more fully set forth herein.

136.    The acts and omissions of **ALL DEFENDANTS**, jointly and severally, constitute deliberate indifference to Plaintiff's serious medical needs in violation of the Article I, section 16, of the Oregon Constitution, by improperly delaying and denying adequate and proper diagnosis and treatment of his serious medical needs from March 12, 2019 to the present.

**FIFTH CLAIM FOR RELIEF: Art. I, § 16, Or. Const: Deliberate Indifference**
**to Serious Medical Needs Failure to Adequately Staff, Train & Supervise**
**(DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN, & DOES)**

137.    Plaintiff re-alleges all facts set forth in paragraphs 1-136, supra, as if more fully set forth herein.

138.    The acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN, and/or DOES**, jointly and severally, in failing to properly staff, train and supervise subordinate employees in a way and to a degree that improperly subjected Plaintiff to deliberate indifference to his serious medical needs in violation of Article I, section 16, of the Oregon Constitution, in one or more of the following particulars:

(a)    For a time, **DEFENDANT DIGIULIO** has failed to comply with his duty to appoint a chief medical officer to provide oversight for professional clinical services to inmates at the OSCI, in violation of OAR 291-124-0016 (2)(b);

(b)    **DEFENDANT DIGIULIO** has failed to comply with his duty under OAR 291-124-0016(2) to provide for professional oversight of the clinical healthcare providers at OSCI & SCI in their acts and omissions related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(c)    **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(b) to ensure that the delivery of inmate healthcare provided to Plaintiff in the

diagnosis and treatment of his serious medical needs from March 12, 2019 to the present meets established standards;

(d)     **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(c) to ensure that the operations of all areas of inmate health care services at OSCI & SCI comply with proper professional standards, statutory requirements, and ODOC rules and policies, with respect to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(e)     **DEFENDANT BUGHER** has failed to properly train and supervise Defendant Irving in the proper organization and coordination of the delivery of healthcare services to inmates at the OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(f)     **DEFENDANT DOE**, the administrator for Clinical Operations has failed to comply with his/her duty under OAR 291-124-0016(6) to ensure the overall organization and delivery of institutional clinical care at OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(g)     **DEFENDANT IRVING** has failed to comply with her duty under OAR 291-124-0020(2)(a) to properly coordinate inmate access to healthcare, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present; and/or

(h)     **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN and/or DOES** have failed to properly train and supervise subordinate employees in the proper delivery of inmate health care, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present.

## SIXTH CLAIM FOR RELIEF:

### Unnecessary Rigor, in Violation of Article I, § 13, Or Const (All Defendants)

139.    Plaintiff re-alleges all facts set forth in paragraphs 1-138, supra, as if more fully set forth herein.

140.    Article I, section 13, of the Oregon Constitution mandates that no prisoner "shall be treated with unnecessary rigor."

141.    "Unnecessary rigor" "is not limited to beatings or other forms of physical brutality; rather, it extends to 'needlessly harsh, degrading, or dehumanizing treatment of prisoners.'" *State v. Moen,* 309 Or 45, 96, 786 P2d 111, 142 (1990) (*In Banc*) (quoting *Sterling v. Cupp,* 290 Or 611, 622, 625 P2d 123 (1981)).

Page: 33 of 43 – COMPLAINT

142.    The acts and omissions of Defendants alleged herein have treated Plaintiff with

"unnecessary rigor" in violation of Article I, section 13, of the Oregon Constitution from March 12,

2019 to the present.

**SEVENTH CLAIM FOR RELIEF: Art. I, § 13, Or Const: Unnecessary Rigor**

**Failure to Adequately Train & Supervise**

**(DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN, & DOES)**

143.    Plaintiff re-alleges all facts set forth in paragraphs 1-142, supra, as if more fully set forth

herein.

144.    The acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or

**DOES**, jointly and severally, in failing from March 12, 2019 to the present, to properly staff, train

and supervise subordinate employees in a way and to a degree that improperly subjected Plaintiff

to unnecessary rigor in violation of Article I, section 13, of the Oregon Constitution, in one or

more of the following particulars:

(a)     For a time, **DEFENDANT DIGIULIO** has failed to comply with his duty to appoint a chief medical officer to provide oversight for professional clinical services to inmates at the OSCI, in violation of OAR 291-124-0016 (2)(b);

(b)     **DEFENDANT DIGIULIO** has failed to comply with his duty under OAR 291-124-0016(2) to provide for professional oversight of the clinical healthcare providers at OSCI & SCI in their acts and omissions related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(c)     **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(b) to ensure that the delivery of inmate healthcare provided to Plaintiff in the diagnosis and treatment of his serious medical needs from March 12, 2019 to the present meets established standards;

(d)     **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(c) to ensure that the operations of all areas of inmate health care services at OSCI & SCI comply with proper professional standards, statutory requirements, and ODOC rules and policies, with respect to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(e)     **DEFENDANT BUGHER** has failed to properly train and supervise Defendant Irving in the proper organization and coordination of the delivery of healthcare services to

inmates at the OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(f)     **DEFENDANT DOE**, the administrator for Clinical Operations has failed to comply with his/her duty under OAR 291-124-0016(6) to ensure the overall organization and delivery of institutional clinical care at OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(g)     **DEFENDANT IRVING** has failed to comply with her duty under OAR 291-124-0020(2)(a) to properly coordinate inmate access to healthcare, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present; and/or

(h)     **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN and/or DOES** have failed to properly train and supervise subordinate employees in the proper delivery of inmate health care, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present.

### EIGHTH CLAIM FOR RELIEF:

### State-Law Tort of Negligence/Medical Malpractice (All Defendants)

145.     Plaintiff realleges all facts set forth in paragraphs 1-144, supra, as if more fully set forth herein.

146.     Plaintiff is entitled to sue the individual public employees for their negligence if any judgment could be otherwise emasculated. Plaintiff is suing the individuals for negligence in their individual capacities. The State of Oregon may be sued in State court for the respondeat superior claims under the State Tort Claims Act.

147.     The acts and omissions of **All Defendants** alleged herein constitutes the state law tort of professional negligence/medical malpractice and violated the appropriate standards of due care in the improper delay and denial of proper and adequate diagnosis and treatment of Plaintiff's serious medical needs in violation of the community standard of care from March 12, 2019 to the present.

### NINTH CLAIM FOR RELIEF:

### Negligence: Failure to Properly Staff, Train & Supervise Subordinates
### (DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN, & DOES)

148.    Plaintiff re-alleges all facts set forth in paragraphs 1-147, supra, as if more fully set forth

herein.

149.    Plaintiff is entitled to sue the individual public employees for their negligence if any

judgment could be otherwise emasculated. Plaintiff is suing the individuals for negligence in their

individual capacities. The State of Oregon may be sued in State court for the respondeat superior

claims under the State Tort Claims Act.

150.    The acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or

**DOES** , jointly and severally, in failing to properly staff, train and supervise subordinate

employees specifically related to the diagnosis and treatment of Plaintiff's serious medical needs

from March 12, 2019 to the present, constitutes the state law tort of professional

negligence/medical malpractice and violated the appropriates standards of due care and the

community standard of care, in one or more of the following particulars:

    (a)    For a time, **DEFENDANT DIGIULIO** has failed to comply with his duty to appoint a
chief medical officer to provide oversight for professional clinical services to inmates at
the OSCI, in violation of OAR 291-124-0016 (2)(b);

    (b)    **DEFENDANT DIGIULIO** has failed to comply with his duty under OAR 291-124-
0016(2) to provide for professional oversight of the clinical healthcare providers at OSCI &
SCI in their acts and omissions related to the diagnosis and treatment of Plaintiff's serious
medical needs from March 12, 2019 to the present;

    (c)    **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-
0016(1)(b) to ensure that the delivery of inmate healthcare provided to Plaintiff in the
diagnosis and treatment of his serious medical needs from March 12, 2019 to the present
meets established standards;

    (d)    **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-
0016(1)(c) to ensure that the operations of all areas of inmate health care services at OSCI
& SCI comply with proper professional standards, statutory requirements, and ODOC rules
and policies, with respect to the diagnosis and treatment of Plaintiff's serious medical
needs from March 12, 2019 to the present;

    (e)    **DEFENDANT BUGHER** has failed to properly train and supervise Defendant Irving
in the proper organization and coordination of the delivery of healthcare services to
inmates at the OSCI, specifically related to the diagnosis and treatment of Plaintiff's

serious medical needs from March 12, 2019 to the present;

(f)    **DEFENDANT DOE**, the administrator for Clinical Operations has failed to comply with his/her duty under OAR 291-124-0016(6) to ensure the overall organization and delivery of institutional clinical care at OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(g)    **DEFENDANT IRVING** has failed to comply with her duty under OAR 291-124-0020(2)(a) to properly coordinate inmate access to healthcare, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present; and/or

(h)    **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN and/or DOES** have failed to properly train and supervise subordinate employees in the proper delivery of inmate health care, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present.

## TENTH CLAIM FOR RELIEF:

### ORS 423.020(1)(d) Violations (All Defendants)

151.    Plaintiff re-alleges all facts set forth in paragraphs 1-150, supra, as if more fully set forth

herein.

152.    ORS 423.020(1)(d) mandates that Defendants shall provide adequate food, clothing,

health, and medical care, sanitation and security for all prisoners.

153.    The acts and omissions of All Defendants alleged herein have violated Plaintiff's statutory

rights guaranteed by ORS 423.020(1)(d) from March 12, 2019 to the present.

/////

### ELEVENTH CLAIM FOR RELIEF: ORS 423.020(1)(d) Violations
### Failure to Adequately Staff, Train & Supervise
### (DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN, & DOES)

154.    Plaintiff realleges all facts set forth in paragraphs 1-153, supra, as if more fully set forth

herein.

156.    The acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or

**DOES**, jointly and severally, in failing to properly staff, train and supervise subordinate employees

in a way and to a degree that improperly subjected Plaintiff to deliberate indifference of his serious medical needs and violated ORS 423.020(1)(d) in one or more of the following particulars:

(a)    For a time, **DEFENDANT DIGIULIO** has failed to comply with his duty to appoint a chief medical officer to provide oversight for professional clinical services to inmates at the OSCI, in violation of OAR 291-124-0016 (2)(b);

(b)    **DEFENDANT DIGIULIO** has failed to comply with his duty under OAR 291-124-0016(2) to provide for professional oversight of the clinical healthcare providers at OSCI & SCI in their acts and omissions related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(c)    **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(b) to ensure that the delivery of inmate healthcare provided to Plaintiff in the diagnosis and treatment of his serious medical needs from March 12, 2019 to the present meets established standards;

(d)    **DEFENDANT BUGHER** has failed to comply with his duty under OAR 291-124-0016(1)(c) to ensure that the operations of all areas of inmate health care services at OSCI & SCI comply with proper professional standards, statutory requirements, and ODOC rules and policies, with respect to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(e)    **DEFENDANT BUGHER** has failed to properly train and supervise Defendant Irving in the proper organization and coordination of the delivery of healthcare services to inmates at the OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(f)    **DEFENDANT DOE**, the administrator for Clinical Operations has failed to comply with his/her duty under OAR 291-124-0016(6) to ensure the overall organization and delivery of institutional clinical care at OSCI, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present;

(g)    **DEFENDANT IRVING** has failed to comply with her duty under OAR 291-124-0020(2)(a) to properly coordinate inmate access to healthcare, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present; and/or

(h)    **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN and/or DOES** have failed to properly train and supervise subordinate employees in the proper delivery of inmate health care, specifically related to the diagnosis and treatment of Plaintiff's serious medical needs from March 12, 2019 to the present.

**PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff prays for a judgment against defendants as follows:

**A.**      Grant declaratory judgment, declaring that:

**1.**      Declare that the acts and omissions of **ALL DEFENDANTS** in the improper delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone (pituitary tumor), toe-nail fungus (related pain, risks from nail removal), hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present as described herein constitutes deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

**2.**      Declare that the acts and omissions of **DEFENDANTS LANEY, HIGHBERGER, GWYNN, NOFZIGER,** and/or **DOES** violated Plaintiff's Due Process rights by failing to comply with procedural guarantees during disciplinary and associated restitution hearings, in violation of the Fourteenth Amendment to the United States Constitution;

**3.**      Declare that the acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or **DOES** in failing to properly staff, train and supervise all subordinate employees specifically related to the delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone (pituitary tumor), toe-nail fungus (related pain, risks from nail removal), hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present as described herein constitutes deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

**4.**      Declare that the acts and omissions of **ALL DEFENDANTS** described herein constitute the denial of the benefit of services, programs and activities of the public entity due to Plaintiff's

disability, and the cost of providing medical care for the disability, in violation the Americans with Disabilities Act (ADA), 42 USC § 12131, *et seq.,* and the Rehabilitation Act of 1973, 29 USC § 794, by improperly delaying and denying adequate diagnosis and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolictin/low testosterone (pituitary tumor), toe-nail fungus (related pain, risks from nail removal), hernia, and headaches all with timely appropriate treatment; from March 12, 2019, and refusing any and all avenues for requesting reasonable accommodation.

5.      Declare that the acts and omissions of **ALL DEFENDANTS** in the improper delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone (pituitary tumor), toe-nail fungus, hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present as described herein constitutes deliberate indifference to Plaintiff's serious medical needs, in violation of Article I, section 16, of the Oregon Constitution;

6.      Declare that the acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or **DOES** in failing to properly staff, train and supervise all subordinate employees specifically related to the delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone (pituitary tumor), toe-nail fungus, hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present, as described herein constitutes deliberate indifference to Plaintiff's serious medical needs, in violation of Article I, section 16, of the Oregon Constitution;

7.      Declare that the acts and omissions of **ALL DEFENDANTS in the improper** delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone

(pituitary tumor), toe-nail fungus, hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present, as described herein subjected Plaintiff to unnecessary rigor, in violation of Article I, section 13, of the Oregon Constitution;

8.    Declare that the acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or **DOES** in failing to properly staff, train and supervise all subordinate employees specifically related to the delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolictin/low testosterone (pituitary tumor), toe-nail fungus, hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present, as described herein subjects Plaintiff to unnecessary rigor, in violation of Article I, section 13, of the Oregon Constitution;

9.    Declare that the acts and omissions of **ALL DEFENDANTS** in the improper delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone (pituitary tumor), toe-nail fungus, hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present, as described herein constitutes the state law tort of professional negligence/medical malpractice;

10.    Declare that the acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING, WARREN,** and/or **DOES** in failing to properly staff, train and supervise all subordinate employees specifically related to the delay and denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone (pituitary tumor), toe-nail fungus, hernia, and headaches all with timely appropriate treatment; from March 12, 2019 to the present, as described herein constitutes the state law tort of professional negligence/medical malpractice;

11.    Declare that a potential negligence judgment could be emasculated but for the inclusion

of the individuals herein;

12.    Declare that the acts and omissions of **ALL DEFENDANTS** in the improper delay and

denial of diagnose and treatment of his: substantial pain (back and knee), spinal stenosis (related

nerve damage, severe pain, and lack of mobility), high prolactin/low testosterone (pituitary

tumor), toe-nail fungus, hernia, and headaches all with timely appropriate treatment; from March

12, 2019 to the present, as described herein violates ORS 423.020(1)(d); and

13.    Declare that the acts and omissions of **DEFENDANTS BUGHER, DIGIULIO, IRVING,**

**WARREN,** and/or **DOES** in failing to properly staff, train and supervise all subordinate employees

specifically related to the delay and denial of diagnose and treatment of his: substantial pain (back

and knee), spinal stenosis (related nerve damage, severe pain, and lack of mobility), high

prolactin/low testosterone (pituitary tumor), toe-nail fungus, hernia, and headaches all with timely

appropriate treatment; from March 12, 2019 to the present, as described herein violates ORS

423.020(1)(d).

B.    Grant Plaintiff nominal damages against **ALL DEFENDANTS,** jointly and separately.

C.    Grant Plaintiff compensatory damages against **ALL DEFENDANTS**, jointly and

separately, in an amount to be determined at trial.

D.    Award Plaintiff reasonable costs, expenses, and attorney's fees pursuant to 42 U.S.C. §

1988, 42 U.S.C. § 12205 and 29 U.S.C. § 794a.

E.    Grant Plaintiff such further relief as this court deems just and equitable under the

circumstances.

   **DATED** this 30th day of August, 2022.

                                      Respectfully submitted,

                                      Myles Nees Pro Se #11703428
                                      3405 Deer Park Dr. SE
                                      Salem, OR 97310